RENDERED: APRIL 10, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

### NO. 2025-CA-1294-ME

TAD E. RUSSELL        APPELLANT

v.        APPEAL FROM WARREN CIRCUIT COURT
HONORABLE DAVID A. LANPHEAR, JUDGE
ACTION NO. 25-D-00123-001

TARA N. SMITH        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: EASTON, ECKERLE, AND McNEILL, JUDGES.

ECKERLE, JUDGE: Appellant, Tad E. Russell ("Russell"), seeks review of an

Interpersonal Protection Order ("IPO") issued on August 18, 2025, by the Warren

Family Court in favor of Appellee, Tara N. Smith ("Smith"). After careful review

of the briefs, relevant law, and record on appeal, we affirm.

## I. Factual and Procedural Background

Beginning in 2021, Smith worked at the Vitamin Shoppe in Bowling

Green, Warren County, Kentucky. Over the following years, Russell became an

increasingly frequent customer, and he often initiated interactions with Smith during his visits. Although these exchanges started as typical conversations between a customer and employee, Russell began to ask Smith personal questions that made her feel progressively more uncomfortable. After an escalating series of events in late 2024 and the first weeks of 2025 that are set forth below, the Warren Family Court ("Family Court") granted Smith's petition for a temporary IPO on February 21, 2025. Record ("R.") at 1-5. After several agreed continuances, the Family Court held a hearing on August 18, 2025. Smith offered testimony at the hearing, but Russell chose not to testify on advice of counsel due to outstanding criminal charges related to the same series of events that resulted in Smith's petition for an IPO.

At the hearing, Smith testified that she had first encountered Russell through her employment at the Vitamin Shoppe and that she had no relationship with him outside of an employee-customer relationship. In September of 2022, Russell left a gift of a food item that Smith had mentioned liking, along with a handwritten note asking for her phone number. The note requested that she contact him outside of work, because "Trying to hunt you down at work makes me feel like a stocker [sic]. Not my thing[.]" At the hearing, Smith authenticated the original note, and the Family Court admitted it as Smith's Exhibit 1. Video Record ("V.R.") 08/18/2025 at 12:45:39-12:47:30; R. at 20.

After reading the note into the record, Smith testified that she felt that the note accurately described Russell's behavior and that she did indeed feel as though he had been trying to "hunt her down" at work. She described an increase in the frequency and length of Russell's visits around the time that he had left the note. She related that he would often enter the store during times when she was working alone and could not avoid interacting with him. However, she did not describe any harassing behavior during that period, and no actions were taken to prevent Russell from continuing to frequent the Vitamin Shoppe as a customer at that time. Instead, Smith testified that she had arranged with her manager to take her breaks at times when Russell had entered the shop so that she could avoid him.

However, Smith reported that, sometime in approximately 2023 or 2024, Russell had followed her out to her car during one of her breaks and had approached her driver's side door to offer her an energy drink that he had purchased for her. Smith testified that she had tried to decline the gift politely at first but finally accepted after he continued to insist that she take it. During that exchange, Russell asked Smith to go on a date with him, which she declined. Russell responded by complaining that she had given him mixed signals. In response to questioning, Smith testified that she had explicitly stated to Russell during that encounter that she felt that she had made it clear that she was not interested and that she had informed him of this fact previously on multiple

occasions. Smith confirmed that her manager came out to the parking lot during that incident and then helped her file a report with the Vitamin Shoppe about Russell's behavior.

Sometime in late 2024 or the first weeks of 2025, another incident occurred in the Vitamin Shoppe parking lot. Smith testified that she had again gone out to her car during a break when Russell pulled his truck behind her car at an angle that blocked her into the space, gunned the engine, and then "laid on the horn" before speeding away onto a side road. *Id.* at 12:52:18-12:53:15. Smith explained at the hearing that this behavior felt very threatening, especially in light of her inability to escape by leaving her vehicle or driving away from him. Because this incident was interpreted as an escalation of Russell's inappropriate actions with Smith, management of the Vitamin Shoppe officially banned Russell from the store.

After the ban, Smith received a message from Russell through her public, LinkedIn profile on February 7, 2025, which the Family Court admitted as Smith's Exhibit 2. R. at 21. The Family Court overruled an objection from Russell that it would be duplicative to read the note into the record and allowed Smith to do so. While reading the message, Smith became visibly emotional as she read the following lines:

I heard some of what you said then I ran over a little girl
. . . haha. Then I lost track of you. I miss you too and
want to be able to see you again.

I really want to talk. I think a lot of wires got crossed
and need to be straightened out. I care about you and
hate that I can't see you on Mondays.

Tad aka Ta Russ

R. at 21; V.R. 08/18/2025 at 12:54:35-12:56:35. Smith testified that the message scared her. She interpreted this post as a threat to run her over based on the previous parking lot incident and a reference that Russell had made in the past about how young and small Smith looked.

The final incident between Russell and Smith occurred on February 20, 2025, the day before Smith filed the petition for an IPO against Russell. Smith testified that, due to the escalating behavior from Russell, she generally did not close the Vitamin Shoppe alone at night without another employee present. However, she testified that on the night of February 20, 2025, she did agree to try closing the store on her own since Russell had been banned from the premises. Smith described walking through her closing procedures that evening and noticing that a truck that resembled Russell's had pulled into the parking lot. However, she could not see into the cab without leaving the store. Smith testified that, prior to walking out to her car, she watched the truck appear to pull away and drive to the

other end of the parking lot, where it sat parked and idling just outside of her line of sight until she left the store and walked further into the lot.

Smith testified that she could finally see the truck clearly once she reached her car and rolled down her window. From that angle, she identified Russell in the cab of the truck and said that she could see him reach into the back of the cab as though grabbing some item, prompting her to call 911. While she was on the phone with the 911 dispatcher, Russell exited his truck and began to approach her vehicle. Smith testified that she had yelled at him to stay away from her and told him that she had called 911 for help. On hearing this, Russell turned and ran back to his truck before speeding away from the lot.

Smith testified that this behavior had left her scared for her life specifically because Russell seemed to be lying in wait for her in his truck on the only night that she had closed alone in months. She expressed concern that the pattern of escalating incidents in the weeks before had left her afraid that he might do something worse, such as following her home or trying to hurt her, especially because the most severe incidents had occurred after repeated instructions from both Smith and her employer to leave her alone. Smith reported that Russell had also attempted to contact her sister on LinkedIn, and he had even done so after the February 20, 2025, incident resulted in criminal charges and the issuance of the temporary IPO.

Although Russell offered no testimony, he did exercise the opportunity to cross-examine Smith through counsel. On cross-examination, Smith agreed that Russell had never behaved in a sexually aggressive manner towards her and never forced his way into her personal space in any of their encounters inside the Vitamin Shoppe. She also confirmed that Russell had never contacted her on her cell phone, although she clarified on re-direct that she had also never given Russell that phone number. While Russell attempted to elicit a different statement of the timeline of events through questioning, Smith confirmed that the LinkedIn message on February 7, 2025, and the final parking lot incident on February 20, 2025, both occurred after Russell had been officially banned from the Vitamin Shoppe. Russell did not call any witnesses or submit any evidence.

Following the hearing, the Family Court completed Administrative Office of the Courts' Form 275.3 ("the AOC Form") and properly checked the box to issue an IPO. R. at 17. Under the section identifying Russell's relationship to the petitioner, the Family Court checked the box indicating that "none of the above relationships apply, but Respondent is alleged to have committed stalking." *Id*. On the second page of the AOC Form, the Family Court selected the option to find "For Petitioner against Respondent in that it was established, by a preponderance of the evidence, that an act(s) of stalking has occurred and may again occur[.]" R. at 18. The Family Court clearly declined to select the option for finding that an act

-7-

of domestic violence and abuse had occurred; it instead selected only the option for stalking. *Id.* In addition to making all required findings on the AOC Form, the Family Court also issued oral findings from the bench that demonstrate its reasoning in issuing the IPO.

Noting that Russell had followed the advice of his counsel to exercise his right to decline to testify given his pending criminal charges, the Family Court found that Smith's testimony and exhibits established that Russell had become "enamored" with her and had made repeated efforts to contact Smith despite her rejection of every overture. V.R. 08/18/2025 at 1:11:24-1:12:25. The Family Court found that this pattern of repeated contact, against Smith's (and her employer's) express wishes, eventually led Smith to fear for her safety. Specifically, the Family Court found that the letter that Russell had left for Smith at the Vitamin Shoppe constituted a "very instructive" sign that Russell understood that even his repeated, less threatening efforts to interact with Smith at work could be "misread" as stalking. *Id.* at 1:12:53. Although the Family Court stopped short of finding that Russell had actually intended to harm Smith during the parking lot incidents involving his truck, it did conclude that these threatening incidents had "scared the liver out of her." *Id.* at 1:13:58-1:14:45.

Russell filed a motion with the Family Court on August 29, 2025, asking the Family Court to reconsider its issuance of the IPO. R. at 22. The

Family Court denied the motion on September 8, 2025. R. at 23. This appeal

followed.

## II. Standard of Review

On appeal, we review the Family Court's issuance of an IPO to

determine whether its findings were clearly erroneous or if it abused its discretion.

*Holt v. Holt*, 458 S.W.3d 806, 812 (Ky. App. 2015).

> Abuse of discretion occurs when a trial court's decision
> is unreasonable, unfair, arbitrary or capricious. More
> specifically, a court abuses the discretion afforded it
> when (1) its decision rests on an error of law . . . or a
> clearly erroneous factual finding, or (2) its decision . . .
> cannot be located within the range of permissible
> decisions.

*Allen v. Eder*, 682 S.W.3d 32, 34 (Ky. App. 2023) (internal quotation marks and

citations omitted).

> A finding of fact is clearly erroneous if it is not supported
> by substantial evidence. Substantial evidence is
> evidence, when taken alone or in light of all the evidence,
> which has sufficient probative value to induce conviction
> in the mind of a reasonable person. We review questions
> of law *de novo*.

*Halloway v. Simmons*, 532 S.W.3d 158, 161 (Ky. App. 2017).

Our Supreme Court has held that a Family Court issuing a protective

order need make only two essential findings of fact:

> (1) whether an act of domestic violence and abuse, dating
> violence and abuse, stalking, or sexual assault has
> occurred, and (2) whether it may occur again. . . . Any

> additional factual findings the trial court makes in issuing
> a protective order are merely supporting those ultimate
> factual findings and are not "essential."

*Smith v. McCoy*, 635 S.W.3d 811, 817 (Ky. 2021).  After conducting a hearing

under Kentucky Revised Statute ("KRS") 456.040, if a Court finds by a

preponderance of the evidence that stalking has occurred and may again occur, the

Court may issue an IPO.  KRS 456.060.  A preponderance of the evidence in

protective order proceedings occurs when the alleged victim was more likely than

not to have been a victim.  *Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007).

In order to find that stalking has occurred for the purposes of a

protective order, KRS 456.010(8) directs use of the criminal definitions of stalking

under KRS 508.140 or 508.150.  Under those statutes, stalking occurs when an

individual has intentionally engaged in two or more acts that were directed at the

victim that seriously alarmed, annoyed, intimidated, or harassed the victim; served

no legitimate purpose; and would have caused a reasonable person to suffer

substantial mental distress.  *Halloway*, 532 S.W.3d at 162.  Additionally, there

must have been an implicit or explicit threat by the perpetrator that put the victim

in reasonable fear of sexual contact, physical injury, or death.  *Id*.

### III. Analysis

On appeal, Russell argues that the Warren Family Court based its IPO

issuance upon insufficient evidence, which constitutes an abuse of discretion.

More specifically, Russell asserts that "neither domestic violence and abuse, nor the future likelihood of domestic violence and abuse was established." Appellant's Brief at 5. While this claim is true, it is a red herring, as it is both misleading and distracting from the true issue. Because Smith requested an IPO based upon stalking, the Family Court was not required to make findings, and thus made none, relative to domestic violence, which requires an established relationship between a petitioner and respondent. While domestic violence orders and IPOs carry the same burden of proof and standard of review, they are both creatures of statute with entirely different findings of fact that must be made by the Family Court before granting a request. *See* KRS 403.720(2) and KRS 456.060. Due to Russell's frequent conflation of the domestic violence and IPO statutes in his briefs, our review has been frustrated by Russell's immaterial arguments regarding the lack of relationship between the parties, his status as an invitee of the Vitamin Shoppe, and the potential prejudice of an improperly entered domestic violence order.

Despite Russell's having two briefs (an appeal and reply), he squanders these opportunities to provide convincing argument and controlling law by focusing on the peripheral requirements that must be satisfied for a domestic violence order. Yet he only identifies one case that directly addresses the central question here of the sufficiency of the evidence for the issuance of an IPO. Russell

-11-

cited *Guenther v. Guenther*, in which we held that a petitioner's "monosyllabic responses to her attorney's leading questions regarding verbal abuse and her fear of future abuse similar to the altercation between the parties is insufficient to base a finding that domestic violence *may* occur again." 379 S.W.3d 796, 802 (Ky. App. 2012) (emphasis in original). However, the passive, elicited facts alleged there are in complete contradiction to Smith's active, unsuggested narration of the events that unfolded here. As we held in *Ashley v. Ashley*, which Russell declined to cite, a hearing in which the petitioner "testified more fully upon questioning by both her attorney and the family court as to her fears" constitutes sufficient evidence and is thus distinguishable. 520 S.W.3d 400, 405 (Ky. App. 2017).

When Russell did turn, at least partially, to the elements of stalking that must be established in order to grant an IPO, he suggested that Smith's testimony did not include sufficient evidence to establish the pattern of conduct or the implicit or explicit threat required by statute. However, he made no direct arguments addressing any of the individual statutory requirements other than asserting that "Smith testified that his [sic] conversations with him made her feel subjectively uncomfortable, but nothing more." Reply Brief at 2. In so doing, Russell repeatedly neglected to address significant portions of Smith's testimony. Under Russell's argued-for version of events for which he failed to provide any evidence, he only spoke with Smith in her capacity as a Vitamin Shoppe employee,

-12-

but then also asked her out on a date on one occasion and offered her gifts twice. Reply Brief at 2. The brief asserts that he never contacted her on her cell phone, never contacted her anywhere else in the community, and never sent her any other communications. Reply Brief at 2. But Russell avoids noting that the statute does not require cell phone contact or specify the location, nature, and/or number of contacts required to constitute stalking.

Moreover, as in *Ashley*, Smith's testimony significantly exceeded terse answers to "yes or no" questions posed by her attorney, and it included substantially more detail than Russell's mere allegations of the facts in his briefs. Despite Russell's desire to avoid engaging with Smith's uncontroverted testimony regarding the events that occurred in February of 2025, we must conclude that ignoring the incidents that establish a course of conduct does not negate a finding that the course of conduct occurred.

A review of the record shows that the Family Court heard testimony from Smith that she became increasingly fearful for her safety in the months leading up to the final, inciting events. The original statement that Smith provided in support of the petition for an IPO clearly establishes a timeline of events that included multiple confrontations in the Vitamin Shoppe parking lot that offer context for Smith's interpretation of Russell's LinkedIn message referencing running over a little girl. R. at 4, 21. Consistent with this original petition, Smith

testified that less than two weeks had passed between the LinkedIn message and the final nighttime incident in February of 2025 that resulted in her call to 911. We cannot say that the Family Court erred in finding this testimony established a course of conduct of two or more incidents that seriously alarmed and intimidated Smith, which also served no legitimate purpose, and which would have caused a reasonable person mental distress.

Other than emphasizing on cross-examination that all in-person events occurred at the Vitamin Shoppe and attempting to establish an alternate timeline of the events that Smith rejected on redirect, Russell offered no evidence to contradict Smith's testimony or the two exhibits that she offered. In light of this essentially unchallenged evidence, Russell's interpretation of the underlying facts appears disingenuous at best and misrepresentative of the actual evidence at worst.

In contrast, Smith offered detailed arguments aligning the facts at issue with the applicable case law. After identifying the elements of stalking and the hearing testimony that substantiated each item in her brief, Smith directly addressed Russell's uncorroborated suggestion that he had never threatened Smith and that she had experienced only discomfort from his attentions. Citing to this Court's holding in *Allen v. Eder*, Smith noted that KRS 508.150(1)(b) allows to suffice either an explicit or implicit threat of sexual contact, physical injury, or

death.  682 S.W.3d 32 (Ky. App. 2023).  In *Allen*, the majority[1] found that substantial evidence existed to support an IPO based on a pattern of threatening behavior, even when the petitioner conceded that the respondent had never acted violently toward her in any of their interactions and had sent "only" menacing text messages suggesting that he was using his authority as a law enforcement officer to surveil guests at her home.  *Id.*

As Smith observed in her brief, the case *sub judice* offers much more direct evidence of threatening behaviors than the parties in *Allen* described.  Unlike those episodes of stalking that occurred after the end of a dating relationship without any allegations of prior threatening behavior, the only contact between Russell and Smith has been his repeated attempts to gain greater access to her at the only place that he could reliably contact her, countered by her consistent rejection and firm statements that she did not appreciate the contact and wanted it to stop.  Smith never dated Russell, interacted with him in a non-professional capacity, or even visited him personally.  She had him banned from her place of employment; and he had no right to be there.  *Cf. Allen*, 682 S.W.3d 32.  Smith has repeatedly expressed that the shift in Russell's behavior over time resulted in her interpretation of his LinkedIn communication as a threat.  She also noted a contrast

---

[1] This Opinion's author dissented in that case on grounds that are not applicable here, *i.e.*, that a law enforcement officer was being held to a different standard than other persons in different professions or no occupation at all.

between her reaction to that message in February of 2025 and her reaction to Russell's initial overtures, which she found distressing but seemingly non-threatening. Given the totality of the circumstances, the record contains sufficient evidence to support the Family Court's finding that stalking had occurred.

Finally, Smith argued to the Family Court, and maintains on appeal, that the evidence from February of 2025 established that incidents of stalking may occur again. As Smith testified, the LinkedIn message on February 7, 2025, and the parking lot incident on February 20, 2025, both occurred after Russell's ban from the Vitamin Shoppe. Despite attempts to insinuate otherwise through questioning, Russell offered no evidence that would contradict Smith's clear testimony and his own LinkedIn message that refers to missing her and to the fact that he could no longer see her on Mondays as he used to do. Smith testified before the Family Court that this escalation in behavior that occurred after Russell lost his only access to Smith suggests that future similar incidents were likely to occur in the absence of a protective order, and the Family Court was well within its discretion to find her testimony credible.

For the reasons discussed above, we affirm the Family Court's issuance of the IPO.

ALL CONCUR.

-16-

BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Matthew J. Baker                        Katina B. Miner
Bowling Green, Kentucky                 Bowling Green, Kentucky